On behalf of Mr. Parker, I received the court's order yesterday to get a little surprise from our court yesterday. I guess it's better a day before the argument than a day after. I guess that's right. And I am prepared to address law and state if the court has questions. Certainly. My plan was to start with the Fourth Amendment stop issues, unless the court decided to move in a different direction. As you wish. The initial traffic stop here, Detective Berlinski made quite clear he made that traffic stop based on his belief that there was a tinted window violation. The district court held that the stop could not be sustained on that basis. And the government said, well, as an alternative basis, Detective Berlinski could have made an investigatory stop based on suspicion that there was an ammunition and firearms violation. And the district court said, that's fine, I'll accept that alternative basis and I will sustain the stop as being lawful. The error there is that the district court can't look to an alternative basis to support an investigatory Terry stop. And there are a number of bases in the case law to support that conclusion. Beginning with Terry, the court said there that the government must point to reasonable articulable facts on which the officer's actions were predicated. Of course, if you're looking to the facts based upon which the officer's actions are predicated, you must be looking at the reason that the officer actually made the stop. Not some other alternative reason the officer could have relied on. And related to that, of course, the reason for the stop, Terry makes quite clear, and the case law since makes it clear, defines the appropriate scope of the stop. It defines what level of force can be used in making the stop. Can handcuffs be used even though it is a Terry stop? Can the officer pull the firearms? Order the person to be ground? Conduct a pat down? What's the nature of the pat down? All those things are determined based on the reason that the officer made the stop. And from practical policy basis, the officer in the field has to be relying on his or her reason for the stop in order to inform his or her actions. Counsel, didn't Berlingski also say another reason was because of what he discerned, what he obtained, the information he obtained from the agent, from the ATF agent? I believe that the excerpt of the record makes quite clear that he repeatedly said that the reason that he made the stop was because he was asked to make a traffic stop. Now, he did also say that I observed this person carrying shopping bags, and I was suspicious that there was ammunition in those bags. But he was asked to make a traffic stop by Agent Wakeland. Question, why did you make that traffic stop answer for the violation of the tinted windows and being advised by Agent Wakeland? And what Wakeland had advised him was what they found out at the gun shop. Well, I guess it depends what he means by advised by Agent Wakeland. Well, the judge is the one who makes that call. And the judge clearly held that, look, the reason here for the stop was the tinted windows. And the judge repeatedly talks to him about it as a pretext of a ruse, that they wanted to make the stop based on tinted windows so that they could investigate whether or not there was a firearms violation. The district court clearly makes that finding repeatedly, that that's what they were doing. They were making the tinted windows stop. But that that wasn't sustainable. And one says, well, but they could have made the stop based on the firearms violation. Isn't that the dispositive point? I mean, if they could have made the stop and if, in fact, that was the underlying reason for which the tinted windows were a pretext, then how is it, how is the case different from Wren? Well, again, I believe in the, Wren is a probable cause situation. Right. They repeatedly make it clear it's a probable cause. And I believe that the case law is clear on a number of bases that you can't, in the investigatory stop violation context, you can't rely on an alternative reason that the officer didn't rely on. And this Court's case in Miles is to that effect as well. In that case, there was a pat-down. The officer pulled something out of the person's pockets, didn't say that he suspected a weapon was in there. The government later wanted to argue that, well, he could have suspected a weapon was in there, a penknife or something. The Court said, no, that's not what the officer pulled. But didn't this officer actually suspect that there was illegal ammunition? He just, he gave a different reason for the stop. But as Judge Silverman said, there's evidence in the record that he knew about the possibility that your client was a felon in possession of ammunition and wanted to look into that. And actually, the tinted windows were a pretext. So it wasn't like it was something that was cooked up after the fact. I agree that would be a much different situation. At the time that the officer makes the Terry stop, his state of mind is, I think I may have a felon in possession of ammunition here, but I'm going to make the stop for tinted windows. But I guess my point is here, he clearly is making the stop for tinted windows. I mean, that's also supported by the fact that he doesn't stop Mr. Parker in the parking lot with the bags in his hands. He stops him out on the street. And so if that was his basis for the stop and that also controls the scope of the stop, then assessing whether it's an appropriate Terry stop, you have to look at his reason for the stop. Now, if you're going to say- Let's assume for the sake of argument that the tinted windows didn't come in at all, that the only reason given for the stop was the fact that he saw him carrying ammunition and verified that he was a felon. Do you think the stop's legitimate? I don't. But I think if that were his reason for the stop, then it would be a Terry analysis. I think because that wasn't the reason for the stop, that it has to be a probable cause analysis. And Wren makes that quite clear. Justice Scalia and Wren talks about, look, if you're talking about like Delaware versus Pratts, which is a checkpoint case, or, you know, Greg, this court makes the same point. If you're talking about a Terry stop, you look at balancing the government's interest versus the nature of the privacy interest. And so you naturally have to look at the reason for the stop. But if there is probable cause, all that goes out of the window because once you hit probable cause, everything tilts towards the government. They can make an arrest, and there isn't that balancing test. So here, if the government wants to rely on an alternative reason, they have to establish that there's probable cause for the stop based on possession of ammunition. Now, I don't think there's reasonable suspicion or probable cause. The government, as is its right, has to rely on the cumulative knowledge of the officers, Agent Wakeland and Detective Berlinski. But also, this court's case law makes clear that if you look at factors that cut against probable cause. Well, what do we have here? We have a brief observation as Mr. Parker drives by. Height and weight, but Agent Wakeland never says he sees him outside the car, so he can't even judge height and weight. We have a person who appears to be a Hispanic male coming back with the name Rodney Parker. You know, it's just one factor, but in the totality of circumstances, it doesn't sound much like a Hispanic name. We have him going into a gun show where Officer Wakeland lets people on his 18-member team know, keep an eye on this guy. He could be a problem. Nothing comes back in a report of him buying anything illegally. He goes into the gun show where, again, Agent Wakeland says you can buy many things that aren't prohibited and aren't restricted. So they don't see anything illegal going on. They've got this weak ID. He comes out of the gun show. He and his girlfriend each have a bag that has something in it. It turns out one of the bags has books, nothing illegal in it. One has some ammunition that they find later. So they don't know what's in the bag. They know they've got this weak identification, and I believe that's the reason Agent Wakeland said, look, because the identification is weak, make the stop first, and let's see what we can develop. Make the traffic stop first, because we've got a problem here with reasonable suspicion of probable cause for a stop based on the ammunition. So they make the stop, and at that point, you know, there's no reasonable suspicion of probable cause for that stop based on everything that they know and the things they've cut against those violence. But the next issue in this context is that once Detective Berlinski approaches the car, he goes up there. He says, you know, he confirms, okay, I've got Rodney Parker here now. He's the registered owner of the car, but says, did you buy some ammunition in the show? Mr. Parker's girlfriend, Ms. Whitmer, says, no, I purchased ammunition in the show. At that point, the district court says, well, he doesn't, you know, the detective doesn't have to accept Ms. Whitmer's representation. He can investigate further. Even accepting that is true, the detective doesn't investigate further. He takes her identifications, he goes to his car, and he sits and he waits 10 minutes for other officers to arrive. Now, that's an unlawful prolonged detention. There's 10 minutes? Yes. Why is that unreasonable? And it's not the matter of the amount of time, but the Supreme Court's case in Sharp makes clear that the officers have to use, you know, diligent means in pursuing, determining, either confirming or dispelling the suspicion. He doesn't do that. And they're waiting for the other agents to come. But he's made the stop based on his thought that he thinks that there's possession of ammunition. So there's no reason he can't. He's, you know, maybe reasonably concerned that these folks have a gun in the car. Oh, I believe he had a partner with him, and I believe there were other sheriff's vehicles there as well. He doesn't say, I'm concerned about my safety or anything like that, I'm waiting for backup. He just sits there and waits 10 minutes. For the backup. No, he did not say that he was concerned. No, I didn't say he said it, but that's what they're waiting for. They're waiting for the other agents. Well, I don't know what he's waiting for. Well, as soon as the other agents came, the show started rolling, right? Well, but if he's, well, the other agent's questioning, yes. But there's no reason Detective Berlinski can't take obvious steps that Judge Burns mentioned, such as saying, well, can I see the receipt? Can I look in the bag, determine who was carrying what bag, see if that statement makes sense? He doesn't do anything for 10 minutes. He just sits there. And this Court's case law makes it quite clear. You have to take obvious investigative steps. I guess I'm having a hard time finding why it would be unreasonable for them to wait for the other agents to come when they see somebody they believe to be a felon coming out of a gun show with ammunition. Well, the unreasonable isn't necessarily waiting for the other agents to come. The unreasonableness is not doing anything to investigate the situation, just sitting there for 10 minutes. And this Court's opinion in Center for Biethical Reform makes clear that you can't just sit there and wait for your supervisor or someone else to show up. If you stop someone, they can terry stop you. You have to take diligent steps to either confirm or dispel whether or not there's support for the stop. But they waited, you say, that's not the time. If they had waited five minutes, you'd have the same argument. Well, I believe so, yes. Three minutes, the same point. I think when it becomes 15 seconds, of course, the issue is a lot longer. I just don't see 10 minutes waiting in the field for other people, other agents to come after they follow some guy coming out of a gun show with ammunition or what they think is ammunition, somebody they believe to be an ex-convict. You know why that's unreasonable for 10 minutes. If we're talking 10 hours, I'd take your point. The case names aren't at the tip of my tongue, but this Court's cases talk about if it's just a traffic violation, it shouldn't take more than a couple minutes. And, again, Center for Bioethical Reform talks about that you shouldn't be waiting there detaining people for your supervisor to show up. If you've got people detained, you need to be taking diligent steps, such as sharp indicates, to confirm or dispel the suspicion. I wonder if you would mind talking about the new case, Vonnie. Sure. My hope is to submit a 28J letter with respect to that opinion. Obviously, the opinion doesn't much help Mr. Parker. But I think that there are a number of, in my review of it last night, there are a number of glaring problems with it. Obviously, as voting for unblock review, this Court can take into account all of these. But assuming it's binding law, do you see distinctions between your argument? The most obvious distinction is this. In the equal protection context, where you have a murderer from Washington who has a conviction from Washington, could be living in California next door to someone from California who has, say, a computer hacking felony. The murderer can possess a gun. The person with the computer hacking felony can't possess a gun. You have that gross disparity. That situation is not addressed in the opinion. They don't talk about the restoration of rights. Now, I've looked at the briefing, and I happen to know that that issue was raised in the briefing. But it's not talked about in the restoration of rights. Moreover, the opinion relies on the Supreme Court's Lewis opinion. And it says, well, we're bound by the holding in Lewis, even though the reasoning is undercut. Well, that's contrary to this Court's opinion on Bonk opinion, Miller v. Gaminey, with respect to the reasoning of opinions undercut. The Court is free to reassess it. It's not bound by a holding that has no basis underneath it. But more importantly, the restoration of civil rights and expungement and pardon aspect, limitation on 921G1, was added to the statute in 1986. Miller was decided, or Lewis was decided, in 1980. So it is clear that the Supreme Court in Lewis didn't have this unequal application, this grossly disproportionate application of the Federal Felon Possession Law in mind when it decided Lewis. Because it didn't exist. The restoration of rights didn't exist. The expungement and pardon, that didn't exist. So it can't be that Lewis governs that situation. Now, I hope to get in touch with the Appellant's Counsel in Monday and maybe in the petition. Hopefully some of those things will be put forward. But I think that this Court can't be bound by Lewis on that issue. That issue is not addressed in the opinion, clearly, at all. And it can't be bound by Lewis because Lewis simply was free. If I could turn back real quickly to the last stop issue, which is after Detective Berlinski took the IDs and got these statements from Ms. Whitmer that she purchased the ammunition and he went and sat in his car, even assuming that's still an investigatory stop context and the Court concludes that that's appropriate, what happens next is when the agents show up, they get Mr. Parker out of his car, take him around the side, surround him and start asking questions. The District Court found at that point that Mr. Parker was under arrest for Miranda purposes. And the government agreed in the District Court. So obviously if he's in custody for Miranda purposes, the case is almost clear, he's also under arrest. So there's probably probable cause at that point. And the only change from the factors I discussed earlier, from when he came out of the gun show and the things that cut against probable cause or reasonable suspicion, is that they've confirmed his identification, but his girlfriend has said, I'm the one that purchased ammunition. Now again, Judge Burns is right. They don't necessarily have to accept that statement as true. But certainly there's not probable cause at that point to arrest him, but yet that's what they do. They arrest him at that point because they show up, they take him into custody and start questioning him. And so that aspect of the stop was unlawful as well. Thank you, Counsel. Oh, that's zero on my end. Negative reservation.  Good morning. May it please the Court. My name is Joseph Orobon. I represent the United States in this matter. I, too, want to start with the Fourth Amendment issue, if that's all right with the Court. And I'll circle back at the end to the recent decision that was issued yesterday. I think it's important to Fourth Amendment analysis that we're clear on what the facts are in this case, because Fourth Amendment analysis is extremely fact-intensive. And I want to make sure that the Court is aware of the record in this case. And I know that in the appellant's reply brief there were some allegations about what the record is. This Court has issued Rule 10, Rule 10 of the Federal Rules of Appellate Procedure, to find what the record is. And in this case, the record is not just the transcript of the proceedings, but also any pleadings and exhibits that are entered into the record at the district court level, which in this case, the government submitted a pleading, which I provided in the supplemental excerpts of record. It includes not only the complaint in this case, which, contrary to the appellant's argument in his reply, is a declaration, signed under penalty of perjury, and more importantly, it's also sworn to before a magistrate judge. So that is a declaration. And that declaration was also signed by Agent Waveland, who is one of our key witnesses at the evidentiary hearing. So I think that the Court can accept the statements that were made by Agent Waveland very near in time to when they occurred, sworn before a magistrate under penalty of perjury. What's the import of that document? I'm sorry? What's the import of that document? The import of that document was to support the factual basis that was put into the record by the government in its pleading itself. It's basically a support to show what he wants to say.  So what does it say? What does it say that's important in the case? It's important in this case because one of the facts under the Fourth Amendment analysis is that Agent Waveland had this weak sort of identification. And I think if you look at page 37 of the supplemental excerpts of record, Agent Waveland clearly stated in his signed declaration that he observed two individuals exit the vehicle and carry a gun show, that among some of the things that he identified or received as identification from the ICE agent that he contacted, he got the address of the registered owner. He identified the registered owner's name. He identified not only the height and weight but also the physical description. And he obtained the criminal record of this individual that he observed when he passed by him enter the gun show. I don't think that that's a weak identification. And I think that it was reasonable for Agent Waveland to rely on all that information and have the records check run and determine that he was a convicted felon. Right, but in the same document it says that the Detective Berlinski initiated the traffic stop as he observed that it was in violation of California vehicle code to say he stopped the car because he was in pursuit of a felon who had ammunition. Well, if you look at the second exhibit that is entered into the record, it's also buttressed by not only Detective Berlinski's statement but also the San Diego police report that I included as well. Detective Berlinski clearly indicates in there that he not only, he describes his observations. This is at 41 of the supplemental excerpts of record. He not only describes his observations and the information that he received from Agent Waveland, which is the date of birth, Rodney Parker's name, the felonies, but he also describes his observations about the stretched bags that he personally observed when he had set up on the vehicle to do the tint, to do the window tint stop or to do a traffic stop. And I think under the Fourth Amendment analysis, we do look at the totality of the circumstances. Counsel wants us just to solely focus on the traffic violation and say you've got to have probable cause for the traffic violation. But it's the totality of the circumstances. You don't pick each piece of the puzzle out and examine it independently. You look at it all together. And Detective Berlinski had, and Judge Burns, when pressed, I believe I asked him, this is at 254 of the excerpts of record, Judge Burns used the word probable cause and he was making probable cause analogies when justifying the stop in this case. And I said, well, wait, Your Honor, it's reasonable suspicion. And Judge Burns stated on 254, he said, I didn't say probable cause, but if I misspoke, the standard, as you pointed out, was reasonable suspicion. Now, if pressed, I did use probable cause analogies. If pressed and I had to make that finding, then I might find also that there was probable cause. Right, but the probable cause that you're referring to in the complaint is probable cause that a crime has been committed, not for the stop. But, or the crime, well, reasonable suspicion is the standard that crime may be afoot. And here you have Detective Berlinski, which I would argue had more than just reasonable suspicion when he had the information that was provided to him from Agent Wakelin, that he had a felon who exited a gun show, which is another key fact in this case. And he observed Agent Wakelin exit that gun show, I'm sorry, Mr. Parker exit that gun show carrying a yellow bag that was stretched. And I believe that at 191 of the excerpts of record, Detective Berlinski, with his 24 years of experience and 10 years of experience at the gun show, he says, look, they saw pallets and pallets of ammunition. I looked at this bag, it was stretched. It was consistent with containing ammunition. And it just has to be a probability. It's not a certainty. He doesn't have to be certain that the bag contains ammunition, but the probability existed. And so he had, absent any traffic violation, he could have pulled that vehicle over in the parking lot. Now, the appellant argues that, well, he should have done it in the parking lot. But this was an operation that was going on at a gun show. There were thousands of people there. These agents were investigating other individuals at the gun show. They wouldn't have made a traffic stop or a stop at all in that parking lot, given the fact that they had a convicted felon in possession of ammunition. And as Detective Berlinski stated, when you've got ammunition, you probably have guns. So I think that the stop was justified. Why isn't it safer to stop him in the car as opposed to in the parking lot? I'm sorry, Your Honor? I mean, I don't understand quite your point on that. It's safer to stop him in a car when you might have, with the tinted windows, you can't see whether there's a loaded gun pointing out or not, as opposed to seeing somebody with a stretch bag in a public area walking across the parking lot. Well, they had marked agents at this, marked patrol cars at the gun show as well as unmarked patrol cars. I think the concern for the agents were, not only would they give up their undercover operation by pulling somebody over in the parking lot, but also for officer safety, if they pulled somebody over in the parking lot and there were other people in the parking lot that might have had firearms, that's a risk to the officers by doing it there, as opposed to waiting for the vehicle to exit the gun show and pulling them over on the side of the road where it's away from the gun show and away from others that may be in possession of firearms when they're not supposed to be. I want to move on to the search of the vehicle. And I think that clearly under Gantt, the search of the vehicle was incident to arrest as valid in this case. I think one of the most important facts here is that if you look at the second prong of Gantt, it clearly states that it's okay to search the car and look for evidence that is relevant to the crime that may be afoot, or that's incident to arrest. Relevant is the key word here. It was okay, as Judge Byrne said, it's the wingspan that the officers are allowed to search. And it was the center console where they searched, which was the wingspan of where they searched. They're not in the car at the point, are they? Correct. But this is the second prong of the Gantt test, not the first prong. I don't dispute that, yes, Mr. Parker is in the back of the patrol car, but they can search after if it's incident to a lawful arrest. Yeah, but their wings are in, you know, a few yards away. I mean, it's – Wings afloat. I purport that they could have searched the vehicle for any evidence that was relevant to the crime. Well, that to me makes more sense than saying it was within their wingspan if they are secured in the vehicle, you know, secured in the ATF car. Well, it also, I guess, goes back to whether or not – like not in this case because the officers had determined that he was under arrest for possessing of that ammunition. Can I just deal with that point for a second because counsel raised it at the end of his argument? So between the time that the Terry stop occurs and the time that the arrest is found to have occurred, does the officer learn anything other than that the girlfriend says it's her ammunition? Are you talking about Detective Berlinski? Yes. I think one of the important things, and this maybe goes to a little bit of the length of the stop, I think it's a misstatement to say that Detective Berlinski went back to his car and sat there and did nothing. That's nowhere in the record. I would purport to the court that if you look at these supplemental excerpts of record at 134 to 135, it details and lays out what Detective Berlinski did. He not only got the driver's license of Mr. Parker and then got the statement from Ms. Whitmer, but he concludes by saying in that testimony that after he gets the statement from, actually gets the driver's license from Ms. Whitmer, the ATF agents start showing up. So there's no testimony that he went back to his car and sat there. I'm not actually asking about the length of detention. I'm asking about if you didn't have probable cause at the time of the stop, but you have to have probable cause when the stop ripens into an arrest, what changes between the time of the stop and the time of the arrest? What additional knowledge does law enforcement have? Well, the law enforcement officers also learned that, and I think the court found that this was a key fact, that Ms. Whitmer had also purchased a gun at the time at the gun show. And so that additional fact. Why does that help? I'm sorry, Your Honor? Why does that help you? That's helpful because what it does is it allows the officers at that time to expand their investigation and adds more facts to the probable cause analysis. Well, that's what I'm trying to figure out, though, is what you have between point A and point B, point A being the stop and point B being the arrest. Ms. Whitmer tries to exculpate Mr. Parker, and she has, there's evidence that she, Ms. Whitmer, has purchased a gun. So are there any other facts that support probable cause to arrest Mr. Parker? Well, it's unclear from the record, but I know that during the stop they did search Mr. Parker. They found cash on Mr. Parker, approximately $1,800 in cash. They found the receipt for the ammunition that was purchased at the gun show on Mr. Parker, and they also found a fraudulent driver's license. And this is before he is arrested for Miranda purposes, according to the district court's factual findings? This is, I believe this is after they put him in, right before they placed him into the car. Right, but I'm trying to figure out, we have these different points in time. So the first point in time, the judges say, you know, this is a Terry stop, and it's a Terry stop that's justified because of the reasonable suspicions having to do with the ammunition, the felon in possession of ammunition. Okay, fine. And then the district court also finds that 10 minutes later, Mr. Parker is arrested for Miranda purposes. And I'm trying to figure out, what do the officers collectively learn in that 10-minute period that causes the reasonable suspicion to ripen into probable cause? I think it's the fact that Mr. Parker is who he says he is, the fact that Mr. Parker is a convicted felon, the fact that the ammunition was found at that point in the backseat of Mr. Parker's vehicle. He's in constructive possession at that time of the ammunition. That's probable cause to arrest Mr. Parker. Well, wait a minute, though. I mean, she says, that's my ammunition, so it's no surprise that there's ammunition in the car, right? Correct. So that's it, her statement. The only additional information you have is that there's ammunition in the car, and she says it's hers. I mean, is that a fair summary of what they learned in that 10-minute period that was different from what they knew before they spoke to anybody in the car? And I would report the addition of Ms. Whitmer saying that I bought a gun, that she had purchased a firearm at the, well, they had the receipt, I believe. They went from a stretched yellow bag, which may or may not contain ammunition, it looks like it's ammunition, to confirming that it was ammunition. Is that right? That's correct. Okay. Well, that's pretty important. Yes, Your Honor. If I can just address the last issue, which is the tape recording in the back of the patrol car. And I know I didn't directly address this in my answering brief, and I just want to do it briefly. The Kwan case, I think, that the appellant cites is just not applicable, and I'll tell you why. The which case? The Kwan case. It's a Ninth Circuit decision. And it's not applicable because you had police officers in that case that were given pagers. They were told if they paid the overages for any personal use, that they wouldn't be audited. Those pagers would not be looked at. Those personal e-mails or texts wouldn't be looked at. And I think what's important in our case is that's not what we have. We don't have, there are no facts in the record. And I implore you that when you go back and look at the record closely, there's, well, the district court says, well, there's no doubt that this was, that they were lulled into, you know, hey, this is your last opportunity to talk in the back of the patrol car. Neither Agent Beals nor Agent Wakelin, and I think this is an important fact, affirmatively told either Mr. Parker or Ms. Whitmer, hey, have a seat in the back of my patrol car. You're free to talk. Nobody's listening. That was never, those facts are nowhere in the record because they didn't happen. And the fact that society is unwilling in that case to say, well, we're not going to give you the opportunity to talk freely in the back of a patrol car, that's unreasonable. And there are several circuits that support that. As opposed to society saying, well, wait, if you pay for the overages for your own personal tax, well, yeah, you do have in that situation the reasonable expectation or society would be willing to recognize that objective reasonable expectation. Last comment on the Vonze case. I think it helps the government, and I assume if Mr. Burns is going to file a 28-J letter, we need to respond. We'll do that. Thank you, counsel. We'll give you a minute for rebuttal. I raised a new issue you didn't discuss, so we'll give you a chance to respond to that. With respect to Judge Vogel's question, nothing developed in that time other than that they confirmed he was Rodney Parker and Ms. Whitmer said, I purchased ammunition. Detective Berlinski didn't even grab the biased ammunition. I don't understand why you poo-poo that.  A little while ago you told us his identification didn't match and he looks Hispanic, but his name is Parker. Okay, so now they've confirmed, number one, that he's Parker, which is a new fact. And now what looks like maybe ammunition they have confirmed is ammunition. I mean, why isn't that very significant? You say nothing happened. Those are two important things that happened. I'm not saying nothing happened. I'm saying those two things are happening. We've still got the things that they know you can buy lawful items in the gun show, that they know that he was in there for three hours and no one's reported observing him doing anything unlawful. Now, Ms. Whitmer says, I purchased ammunition. Detective Berlinski doesn't say, can I see a receipt? He doesn't grab the two bags and determine who was carrying which bag, anything like that. And Judge Burns says there are things that he could have done to investigate at that time. He doesn't do them, and nothing else happens. The statement says, I bought a firearm in there. That's all made later after they get them out of the car. So I'm just being clear on what facts. And the 10-minute finding is at 255 to 57, that he didn't do anything for the 10 minutes that he waited there. That's Judge Burns' finding. It's clearly set out. If I may just say one more thing regarding the wiretap issue. I failed to point out, I should have pointed out, the Supreme Court has granted a review in Quan. So that's then what's wrong. But there are other cases cited in there for the simple prospect that if the government leads someone to believe you're having a private conversation, it's reasonable for that person to believe you're having a private conversation. And I cited a number of cases, district court and Sixth Circuit case in there. They're in the context of, you know, like a prison. Normally in a prison, you wouldn't think you're having a private conversation. But if prison officials tell you you can have a private conversation, you know, you can use this line to make a private call, then it's reasonable that you think it's private. You know, they can't lie to you and then say, well, you're unreasonable in believing me. That's a very common-sense proposition. Thank you. Interesting case. So thank you both for your arguments. If we want additional briefing, we will ask for it, but we'll confer on that first. Maybe 28-J letters will be sufficient. We'll let you know. The case that's heard will be submitted for decision. We'll proceed to the next case on the oral argument calendar, which is Rucker v. Lattimore.
judges: Fogel, Thomas, Silverman